UNITED STATES of America, Appellee,

v.

Jesus VAZQUEZ, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Esteban PIZARRO,
Defendant, Appellant.

Nos. 87–1371, 87–1372.

United States Court of Appeals,
First Circuit.

Heard June 8, 1988.
Decided Sept. 15, 1988.

See also, D.C., 681 F.Supp. 95.

Jose C. Romo Matienzo, Rio Grande, P.R., by Appointment of the Court, for defendants-appellants.

Ramon Garcia Garcia, San Juan, P.R., by Appointment of the Court, on brief, for defendant-appellant Jesus Vazquez.

Jose A. Quiles, Asst. U.S. Atty., Criminal Div., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

Defendants-appellants Jesus Vazquez and Esteban Pizarro were convicted on all four counts of an indictment for (1) conspiring to import cocaine into the customs area of the United States in violation of 21 U.S.C. § 963; (2) aiding and abetting in the possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; (3) aiding and abetting in the possession of cocaine aboard an aircraft arriving in the United States in violation of 21 U.S.C. § 955 and 18 U.S.C. § 2; and (4) aiding and abetting in the importation of cocaine in violation of 21 U.S.C. § 952 and 18 U.S.C. § 2. Vazquez challenges his conviction on all four counts; Pizarro limits his appeal to the charge of conspiracy. We affirm the convictions.

## I. FACTS

On May 29, 1986, a Viasa Airlines flight originating in Venezuela arrived at the International Airport in San Juan, Puerto Rico. United States customs inspectors on duty at the airport observed appellants Vazquez and Pizarro separately disembarking from the aircraft. Appellants' behavior aroused the suspicions of the customs officials, who testified at trial as to the events that followed appellants' arrival in the United States.

Juan Hurtado Gelpi, a customs inspector working for the contraband enforcement team, observed Vazquez coming out of the gateway from the Viasa plane. Vazquez attracted his attention because he was carrying a bag that bore a logo from a town in Puerto Rico and yet held in his hand a Venezuelan passport. Hurtado stopped Vazquez and asked him if he previously had visited the United States. Vazquez denied any prior visits; his passport confirmed that denial. Hurtado then inquired as to how appellant had acquired the Puerto Rican bag that he carried off the airplane. Vazquez explained that the bag belonged to a Puerto Rican friend, Angel Santiago, whom he was to visit, and that he had decided to return the bag during his stay in Puerto Rico. When Hurtado

then asked Vazquez to open the bag, he immediately noticed a pair of boxing gloves inside. The presence of the gloves surprised him because Angel Santiago is a well-known basketball player in Puerto Rico. Vazquez explained that the gloves were his own, and that he enjoyed boxing as a form of exercise.

Hurtado turned his attention back to the bag, and found a boxing license and social security card, both bearing the name of Esteban Pizarro. At that point, another customs inspector, Juan Arroyo, told Hurtado that he had noticed Pizarro, a well-known middleweight boxer, disembarking from the Viasa flight. Hurtado questioned Vazquez, who stated that he did not know Pizarro nor did he know why Santiago might have Pizarro's identification among his belongings. Hurtado ended his inspection at that time; however, he made a notation upon Vazquez's customs declaration card that called for a secondary inspection. Later, when Hurtado arrived in the secondary inspection area, he instructed another customs inspector to take Vazquez to a separate room for a search. At that time, Hurtado noticed that Vazquez was holding a customs declaration card other than the one he had marked earlier. The new card bore no notation requiring a secondary inspection. There is no evidence about what occurred in the search room, or how the decision was made to take Vazquez from that location to the supervisor's office.

The government's next witness, Inspector Arroyo, testified as follows. Arroyo noticed appellant Pizarro disembarking from the Viasa flight and stopped him for routine questioning. Pizarro told Arroyo that he had been on a pleasure trip in Venezuela, and that he was traveling with a friend. His passport confirmed that he had been in Venezuela for the three previous days. After a brief exchange, Arroyo allowed Pizarro to move on. Arroyo then noticed Inspector Hurtado stop Vazquez and he overheard their conversation. In light of Pizarro's presence on the flight, Arroyo found Vazquez's possession of Pizarro's identification coupled with a denial of any personal relationship to be suspicious. Arroyo therefore notified the supervisor, Inspector Maria Palmer, of the situation. Inspector Palmer stopped Pizarro, asked him a series of routine questions, and then sent him on for a secondary inspection.

Customs Inspector Felix Ramos performed the secondary inspection of Pizarro. Both Ramos and Arroyo were present at the inspection, which they described at trial. Ramos first asked Pizarro a series of questions in the customs enclosure area. Pizarro stated that he was traveling with a friend named Jesus. A few minutes later, Inspector Hurtado arrived and asked Pizarro if he knew Vazquez. Pizarro responded in the affirmative and explained that they were traveling together. When Hurtado told Pizarro that Vazquez denied any friendship, Pizarro responded: "How come he doesn't know me? He was traveling with me. I don't know why he says that. Where is he at? Do you want me to talk to him?" At that time, the inspectors decided to take Pizarro to "the search room" for a search. Ramos informed Pizarro that he was going to perform a physical search. Pizarro objected, and after a moment, he stated that he was carrying something illegal. He then removed three packages that were strapped to his body, which were identified later as containing cocaine. Ramos placed Pizarro under arrest, read him his rights, and moved him to a different room: the supervisor's office.

Inspector Ramos testified that after another five to ten minutes, an unnamed customs official brought Vazquez into the supervisor's office. Pizarro was there in the presence of both Ramos and Arroyo. Ramos testified that Vazquez immediately addressed Pizarro: "Listen, why you say you know me? I don't know you. I don't know you. I never seen you before." Pizarro responded: " 'No me joda.' You know me. Now I'm going to get all the blame and you guys are going to get out." Following this exchange, the customs officials moved Pizarro to a different room. The record does not reflect whether this was the same room in which Pizarro was taken initially for a body search or some other room.

Both Inspectors Arroyo and Ramos further testified that Pizarro and Vazquez subsequently were permitted to leave the customs enclosure area, under surveillance, in hopes that they would inadvertently identify anyone awaiting them in the airport. At first, Pizarro walked out alone, waited a few minutes without interacting with anyone, and then returned to the customs area. The two appellants then exited together, Vazquez walking behind Pizarro. At that time, Angel Santiago was standing outside the customs enclosure area. As the appellants approached Santiago, Vazquez moved ahead of Pizarro, said something to Santiago that the customs officials could not hear, and Santiago began to walk away. The customs officials stopped Vazquez and Pizarro and asked Santiago to accompany them to the customs enclosure area for questioning.

On June 4, 1986, Vazquez, Pizarro and Santiago were indicted. A three-day jury trial was held in February, 1987. At trial, the only additional evidence admitted relevant to this appeal was the testimony of Maribel Centeno Ortiz. Centeno explained that she had agreed to testify as part of a plea agreement with the government stemming from another indictment. On direct examination, Centeno testified that she had overheard a conversation between Vazquez and Santiago at her apartment complex in Puerto Rico in May 1986. She stated that Vazquez and Santiago were discussing whether to send Pizarro on a trip, and whether Pizarro would talk if he were caught. Her testimony was impeached on cross-examination, both by physical evidence (the passport of Vazquez did not support Centeno's assertion that he had been in Puerto Rico prior to his arrival on the Viasa flight) and by pointing out inconsistencies in her story.

At the close of the government's case, the court granted Santiago's motion for acquittal. Fed.R.Crim.P. 29(a). The court denied similar motions by Vazquez and Pizarro. The jury found appellants guilty on all four counts of the indictment.

Vazquez argues that (1) the district court committed constitutional error by admit-ting into evidence the interchange between him and Pizarro in the supervisor's office; (2) there was insufficient evidence to support his convictions; and (3) he should have been granted a new trial due to newly discovered evidence. Pizarro joins Vazquez in his arguments that there was insufficient evidence on the conspiracy count and that the district court should have granted a new trial because of newly discovered evidence. We address each argument in turn.

## II. ADMISSIBILITY OF DEFENDANTS' STATEMENTS

Vazquez objects on various grounds to the admission into evidence of the interchange between him and Pizarro in the supervisor's office. In that exchange, Vazquez said to Pizarro: "Listen, why you say you know me? I don't know you. I don't you. I never seen you before." Pizarro's retort was: " 'No me joda.' You know me. Now I'm going to get all the blame and you guys are going to get out." Because we find no error in the district court's evidentiary rulings on the admissibility of these statements, we reject Vazquez's contentions.

### A.

Vazquez's most significant claim is that the statements were the products of an unconstitutional custodial interrogation made before Vazquez had been informed of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, we must decide whether the customs officials' action in taking Vazquez to the supervisor's office constituted a form of "custodial interrogation," as that concept has been defined by the Supreme Court. If so, the failure to administer the *Miranda* warnings to Vazquez before bringing him to the room would require suppression of any statements he made as a result of the "interrogation." In addition, Pizarro's response—as the "fruit" of Vazquez's statement—would also have

to be excluded.[1]

The Supreme Court developed the *Miranda* rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal of ensuring that any statements made by a suspect are "truly the product of free choice." 384 U.S. at 457, 458, 86 S.Ct. at 1619. In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court was asked to decide whether a police practice not involving direct questioning was the functional equivalent of "interrogation." The defendant, a murder suspect, had been picked up by police officers and was being driven to a police station in the back of the officers' cruiser. The defendant was separated from the officers only by a wire mesh and could hear and be heard by the officers. The murder weapon, a sawed-off shotgun, had not been found, and the officers in the car expressed their concern that handicapped children in the vicinity would come across it and be injured. Upon hearing the conversation, the defendant—who had been given a *Miranda* warning and who stated his desire to see an attorney before making any statement—directed the officers to the weapon. The question before the Court was whether his confession as to the location of the weapon was coerced or compelled, that is, whether it was the result of "interrogation" or its equivalent.

In addressing the issue, the Court reviewed the concerns that underlaid its decision in *Miranda:* Many "police practices" do not involve express questioning, but nonetheless create an environment in which the degree of coerciveness is equivalent to that of direct questioning. Such "techniques of persuasion" include "the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.'" 446 U.S. at 291, 100 S.Ct. at 1682 (quoting *Miranda*, 384 U.S. at 450, 86 S.Ct. at 1615). The Court then concluded:

[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they—*should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–02, 100 S.Ct. at 1690 (emphasis in original) (footnotes omitted). Applying that standard to the facts before it, the Court concluded that the record did not show that the officers should have known that their conversation about the handicapped children was reasonably likely to elicit the defendant's self-incriminating response. *Id.* at 303, 100 S.Ct. at 1690–91.

More recently in *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), the Court considered whether police officers had "interrogated" a man suspected of killing his son when they allowed his wife to converse with him in the presence of another officer who openly recorded the defendant's statements. At trial, the ser-

---

**1.** Our discussion *infra* will focus only on whether the police actions in this case constituted "interrogation." Because that issue is disposi- tive, we need not also consider whether Vazquez was in custody.

geant, who had made the decision to allow the conversation to take place, testified that when he placed another officer in the room, he knew that the defendant possibly would make an incriminating statement. *Id.* 107 S.Ct. at 1934 n. 2.

Applying the *Innis* standard, the Court held that the officers' actions were not the "functional equivalent" of police interrogation. Although the police officers were aware of the possibility that Mauro would incriminate himself while talking with his wife, the Court stated that "[w]e doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." 107 S.Ct. at 1936. The Court emphasized that the purpose underlying *Miranda* was to "prevent[ ] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* at 1936–37. That danger was not implicated in the case before it. Moreover, the Court found that the officers acted reasonably and in good faith; they were not required to bar suspects from speaking with their spouses or prohibited from doing so in a way that met legitimate security concerns. *Id.* at 1937.

In one way, this case is just like *Mauro.* The police brought together two suspects who might be expected to speak to each other. *Mauro* tells us that this action, without more, is not the equivalent of interrogation. Indeed, it could not be that simply bringing two individuals, even two suspects, together is so frequently likely to be coercive that the *Miranda* presumption should apply.

A customs official would have no reason to anticipate that processing simultaneously two narcotics suspects through search and arrest procedures would trigger an incriminating statement. Although two suspects who know each other might be expected to converse when placed side-by-side, that expectation is insufficient to trigger the prophylactic recitation of *Miranda* warnings. *See Mauro,* 107 S.Ct. at 1936 & n. 6 (a "possibility" that a suspect would incriminate himself is insufficient to meet the *Innis* standard). Unlike direct questioning, simply placing two individuals or suspects in the same area does not focus the police attention on a suspect in such a way that the suspect necessarily would feel added pressure—pressure "above and beyond that inherent in custody itself"—to say something. *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689. That added, directed *compulsion* is what the *Miranda* doctrine was designed to alleviate.[2]

Despite our clear sense that bringing two suspects together does not by itself trigger the need for *Miranda* warnings, this is a difficult and close case. *See Mauro,* 107 S.Ct. at 1939 (Stevens, J., dissenting) ("It is undisputed that a police decision to place two suspects in the same room and then to listen to or record their conversations *may* constitute a form of interrogation even if no questions are asked by any police officers.") (Emphasis added.) In deciding whether the *Miranda* presumption of coercion should apply in a given case, it is appropriate to focus "primarily upon the perceptions of the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1690. "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302 n. 8, 100 S.Ct. at 1690 n. 8.

**2.** We note that even if it were the case that bringing two suspects together reasonably might be expected to compel a statement from one of them, such a procedure might be permissible if it were a standard operating procedure "normally attendant to arrest and custody." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90. Police officers obviously may not be handicapped to such an extent that they are prevented from arresting and identifying suspects before giving the *Miranda* warnings and awaiting the arrival of requested counsel. Of course, the police may not adopt interrogation techniques as "standard operating procedure" simply to avoid the *Miranda* requirements. A practice that was not necessary to the smooth functioning of the arrest process would not be eligible for a "waiver" from the *Miranda* requirements.

In this case, at least some of the officials knew that Vazquez and Pizarro were providing inconsistent stories about their relationship. Thus, it could be argued that the customs agents should have known that the conflicting stories would make Vazquez feel unusually pressured when confronting Pizarro to say something that would persuade the authorities that he did not know Pizarro. In addition, unlike in *Mauro,* the authorities here could be reasonably sure of the nature of the comments likely to be made by the suspect and his possible associate—comments concerning their relationship that would be directly relevant to Vazquez's guilt or innocence. In *Mauro,* where the two individuals were husband and wife and there was no previous conflict in their statements to police officers, it arguably was less likely that any conversation would be directly relevant to the suspect's guilt or innocence, and thus "incriminating." In *Mauro,* the couple would be just as likely to discuss personal matters.

These differences put this case much closer to the *Miranda* line than was *Mauro.* Nevertheless, we conclude that bringing together—*in an otherwise non-coercive setting*—two suspects who have given authorities conflicting stories is not sufficiently likely to elicit an incriminating response to meet the legal standard of "interrogation." In this case, the record shows a sudden, spontaneous exchange between Vazquez and Pizarro as soon as Vazquez was brought into the supervisor's office. There is no suggestion that the customs agents thrust Vazquez in front of Pizarro in an effort to "elicit" a comment from either of them. Nor is there evidence of any other tactic designed to encourage Vazquez or Pizarro to erupt upon meeting. This room was neither packed full of hostile officers glaring at Vazquez nor was there evidence that the officers had primed Vazquez for the meeting by expressly suggesting that he confront Pizarro head-on.

Our conclusion on whether a *Miranda* violation occurred might well be different had Vazquez presented evidence showing that the customs agents *sought* to elicit incriminating statements from him. "[W]here a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Innis,* 446 U.S. at 302 n. 7, 100 S.Ct. at 1690 n. 7. Although a purpose to elicit information is not dispositive, our consideration of the actual impact of the technique cannot help but be influenced by whether the police believed that it would produce a response from the suspect.

In this case, however, Vazquez presented no evidence indicating that the customs officials engaged in a conscious design to create an "interrogation environment." There is, for example, no evidence that the customs agent who brought Vazquez to the supervisor's office even knew that Pizarro already was there. In fact, the officers may simply have been processing Pizarro in the supervisor's office and, by happenstance or ordinary process, Vazquez was brought to the same room. Indeed, the customs officers may have planned, consistent with routine procedure, to give Vazquez the *Miranda* warnings when he reached the supervisor's office. That the exchange between the two suspects was unanticipated, and unintended, is a logical inference from the fact that Pizarro was quickly removed from the room after it occurred.

■ We note, moreover, that the defendant made virtually no attempt to prove to the district court that he was either in custody or interrogated. He failed to request a suppression hearing, and only through the most generous reading of the transcript can it be said that he preserved the custodial interrogation issue. Indeed, defendant did not attempt to exclude his own statement until the day after it was offered into evidence. His argument regarding Pizarro's retort, made briefly during a sidebar conference during trial, focused on whether it should not be admitted because of an *in limine* order excluding certain of Pizarro's post-arrest statements. Although counsel did allege during the conference that both defendants were "in custody" at the time of the exchange, this assertion seems to have related only to

whether the statements were made after arrest for purposes of the *in limine* motion. Counsel never mentioned *Miranda* at this time, nor did he suggest that Pizarro's statement should be excluded because of a violation of *Vazquez's* constitutional rights.[3]

Because we conclude that on this record the defendant has failed to show that the customs agents violated the *Miranda* doctrine, the district court did not err in admitting into evidence Vazquez's and Pizarro's statements.

## B.

Vazquez raises several other grounds for excluding Pizarro's statement, all of which are more readily rebutted. First, he suggests that the district court already had ruled the comment inadmissible in an *in limine* order. That order, however, merely excluded any post-arrest declarations by Pizarro made "out of the presence" of Vazquez. The "out of the presence" condition was requested by Vazquez himself. Clearly the statement in question is not covered by that order.[4]

■ Next, Vazquez disputes the government's contention that the statement was admissible as the declaration of a co-conspirator under Federal Rule of Evidence 801(d)(2)(E), since that Rule excludes from hearsay treatment only statements made "during the course and in furtherance of the conspiracy." Vazquez is correct in this regard—undoubtedly the conspiracy was over by the time that Pizarro accused Vazquez of leaving him holding the bag (so to speak), and the declaration is

in fact hearsay. But Rule 801(d)(2)(E) is not the logical basis for admission of the statement.[5] Instead, it is admissible as a hearsay *exception* under Rule 803(2) because it was made "while the declarant was under the stress of excitement caused by [a startling] event or condition."[6] *See United States v. Bailey*, 834 F.2d 218, 228 (1st Cir.1987). The customs official testified that after Vazquez reproached him, Pizarro "got mad at that moment" and lashed out at Vazquez. Given the circumstances of the abrupt encounter, Pizarro's spontaneous statement had sufficiently substantial guarantees of trustworthiness to allow its admission as an exception to the hearsay rule. Indeed, if Vazquez had *not* been part of the plan to import, little purpose would be served in Pizarro accusing him of such; there would be no reason for Pizarro to implicate his "friend" *unless* he felt that he was being hung out to dry.

■ This same logic defeats Vazquez's final ground for exclusion. He contends that the statement amounts to a confession or admission of a codefendant, inadmissible as a violation of the confrontation clause of the Sixth Amendment under the teachings of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We already have held that *Bruton* does not present an obstacle to admission of a statement otherwise admissible as a spontaneous exclamation. *McLaughlin v. Vinzant*, 522 F.2d 448, 450–51 (1975). Recently we have established even more clearly that excited utterances, whose admission emanates from a "firmly rooted hearsay exception," *see Ohio v. Roberts*, 448 U.S. 56, 66,

---

3. The day after the statements were introduced into evidence, counsel moved the Court to strike *Vazquez's* statement because of a *Miranda* violation, but did not renew his attempt to exclude Pizarro's response.

   As to Vazquez's statement, we note additionally that it was cumulative, and therefore unnecessary to the government's case. He already had denied any knowledge of Pizarro, and the statement in the supervisor's office merely reiterated that professed ignorance. Any error in not excluding the statement, therefore, would have been harmless.

4. This is not to say that, even if the *in limine* order did bar admission of the contested state-

   ments, the district judge could not have amended that order during trial. Because the order was not superseded, however, we need not consider the propriety of any possible amendment by the district court.

5. We note that Vazquez's counsel made no hearsay objection to the district court; counsel mentioned only the *in limine* motion and the coerced statement argument.

6. Because of this, we need not decide whether it might also be considered a statement contrary to the unavailable declarant's interest under Rule 804(3).

100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), bear adequate "indicia of reliability" to avoid running afoul of the confrontation clause. *Puleio v. Vose*, 830 F.2d 1197, 1204–06 (1st Cir.1987). The admission of Pizarro's statement therefore withstands this final challenge.

### III. NEWLY DISCOVERED EVIDENCE

■ Both appellants allege that the trial court erred in denying their motion for a new trial based on newly discovered evidence. The evidence in question was a guilty plea by witness Centeno Ortiz to an indictment charging her with perjury and giving a false statement to the Drug Enforcement Administration. These falsehoods were completely unrelated to the trial of these defendants or to the events underlying their indictment.

A motion for new trial on the basis of newly discovered evidence ordinarily will not be granted unless the moving party can demonstrate, *inter alia*, that "the evidence is material, and not merely cumulative or impeaching; and ... will probably result in an acquittal upon retrial of the defendant." *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980). The district court was well within its broad discretion in finding that appellants had failed to satisfy either of these conditions.

Appellants clearly fail to reach the first threshold. The evidence of Centeno Ortiz's perjury is immaterial to the substantive proof of the narcotics endeavor in this case, and would be valuable only as a general basis for impeaching her credibility. This is insufficient for a new trial. Moreover, Centeno Ortiz's testimony already had been thoroughly discredited, as explained by the district court in its opinion.

The second, related component of appellants' burden is also lacking. Even without Centeno's testimony, i.e., presuming that her credibility was completely impeached, defendants still undoubtedly would have been convicted. As the trial judge noted, her testimony was completely unnecessary and a new trial without it would result in the same outcome. We recapitulate the evidence briefly: (1) Pizarro, a well-known boxer, entered the United States from Venezuela carrying a substantial quantity of cocaine on his body; (2) Vazquez arrived in Puerto Rico on the same plane; (3) Vazquez was carrying Pizarro's New York Boxing Commission license and boxing gloves; these were items that would bring immediate attention to Pizarro if noted by the customs officials, but were, in the words of the district court "priceless possessions in Pizarro's profession and ones not lightly entrusted to others"; Vazquez also had possession of Pizarro's social security card; (4) Vazquez repeatedly denied any personal knowledge of Pizarro at the same time that Pizarro was claiming to have traveled from Venezuela with Vazquez; (5) during their confrontation in the supervisor's office, Pizarro angrily and spontaneously confronted Vazquez about the latter's attempt to pin all the blame on the former, exclaiming: "You know me. Now I am going to get all the blame and you guys are going to get out."

The evidence indubitably shows that Vazquez was aiding Pizarro's attempt to import cocaine into the United States. If he had been an innocent tourist unaware of what was in his bag, he would not have lied about his knowledge of Pizarro. The cocaine was of sufficient quantity that it was certainly for distribution rather than personal use. An agreement between the two defendants to import the drugs also was proven clearly through the combination of Vazquez's assistance and Pizarro's credible accusation that "you guys are going to get out"—the latter statement indicating that the enterprise to import cocaine was planned jointly by the two of them. The conspiracy is thus proven, the overt act of each defendant being the flight from Venezuela to Puerto Rico with the cocaine. Even without Centeno Ortiz's testimony, we believe that the jury would have returned guilty verdicts on all counts.

### IV. SUFFICIENCY OF THE EVIDENCE

■ Vazquez challenges the sufficiency of the evidence against him on all four

counts. Pizarro claims that there was inadequate proof of the conspiracy. As we have explained in the preceding section, the evidence was more than sufficient to support the verdicts on which the jury agreed.

Because all of the appellants' contentions are unavailing, their convictions must be *affirmed*.