February 2, 1993

 UNITED STATES COURT OF APPEALS
 For The First Circuit

 

No. 92-1435

 UNITED STATES OF AMERICA,

 Plaintiff, Appellee,

 v.

 JEAN M. TAYLOR,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]
 

 

 Before

 Selya, Circuit Judge,
 

 Coffin, Senior Circuit Judge,
 

 and Cyr, Circuit Judge.
 

 

 Arlene C. Halliday for appellant.
 
 Margaret D. McGaughey, Assistant United States Attorney, with
 
whom Richard S. Cohen, United States Attorney, and Timothy C. Wing,
 
Assistant United States Attorney, were on brief for appellee.

 

 February 2, 1993
 

 CYR, Circuit Judge. Jean Taylor appeals the judgment
 CYR, Circuit Judge.
 

of conviction and sentence entered against her on one count of

knowingly and intentionally manufacturing marijuana in violation

of 21 U.S.C. 841(a)(1), 841(b)(1)(B) and 18 U.S.C. 2. We

affirm.

A. Probable Cause for Search Warrant
 

 On the morning of July 17, 1991, Robert Hutchings, Jr.,

a special agent of the Maine Bureau of Intergovernmental Drug

Enforcement ("BIDE"), spoke with a confidential informant who

reported that he recently had visited appellant Taylor and her

husband at property in Levant, Maine, upon which the Taylors

resided in separate mobile homes. The informant observed several

large marijuana plants (up to 4 feet tall) growing in appellant's

vegetable garden and around the perimeter of her mobile home,

several hundred marijuana seedlings (5 to 6 inches tall) growing

in milk cartons and crates and awaiting transplantation to nearby

woods, and an "unusual amount" of zip lock storage bags inside

appellant's residence. During one visit, appellant told the

informant she was concerned because she had started more seed-

lings than she could tend.

 The same day he received the tip from the informant,

Agent Hutchings consulted the affidavit submitted in support of a

1986 search warrant application, in which another officer attest-

ed that he had purchased marijuana from Taylor on two occasions

and personally observed marijuana plants growing on her property.

A local drug task force report noted that Taylor had pled guilty

to two counts of marijuana trafficking in October 1986. Incorpo-

rating this evidence into an affidavit, Hutchings obtained a

state court search warrant which was executed later that day.

Appellant ultimately was charged in the United States District

Court for the District of Maine with manufacturing marijuana in

violation of federal law.

 The district court denied appellant's motion to sup-

press the physical evidence (marijuana plants and drug parapher-

nalia) based on an alleged absence of probable cause to support

the search warrant. Appellant contends that Agent Hutchings'

sworn statements vouching for the informant's reliability were

conclusory and that the tips provided by the informant were

inadequately corroborated.

 The sufficiency of a search warrant affidavit is

appraised against well-established criteria:

 The task of the issuing magistrate is simply
 to make a practical, common-sense decision
 whether, given all the circumstances set
 forth in the affidavit before him, including
 the "veracity" and "basis of knowledge" of
 persons supplying hearsay information, there
 is a fair probability that contraband or
 evidence of a crime will be found in a par-
 ticular place. And the duty of a reviewing
 court is simply to ensure that the magistrate
 had a "substantial basis for . . . conclud-
 [ing]" that probable cause existed.

United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990)
 

(quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)) (cita-
 

tions omitted); see also United States v. Ventresca, 380 U.S.
 

102, 108 (1965). The reviewing court does not undertake de novo
 

 3

review, but accords "great deference" to the probable cause

determination. United States v. Ciampa, 793 F.2d 19, 22 (1st
 

Cir. 1986) (citation omitted).

 The Hutchings affidavit tersely attests that the infor-

mant "has provided reliable information [to law enforcement

officials] in the past." Standing alone, so conclusory a state-

ment might not provide an issuing magistrate with the requisite

"'substantial basis for concluding that probable cause existed.'"

 Caggiano, 899 F.2d at 103 (quoting Gates, 462 U.S. at 238-39).
 

On the other hand, an informant's reliability need not invariably

be demonstrated through a detailed narration of the information

previously furnished to law enforcement for example, by

listing the number or names of persons arrested or convicted as a

consequence of the informant's prior assistance. Rather, the

affidavit may disclose an adequate basis for evaluating the

informant's veracity through the very specificity and detail with

which it relates the informant's first-hand description of the
 

place to be searched or the items to be seized. Id. at 102-03
 

(reliability of information enhanced if details derived from

informant's personal observation, rather than from hearsay)

(citing Ciampa, 793 F.2d at 24). As was the case in Caggiano,1
 

the informant provided Agent Hutchings with a detailed descrip-

tion of the premises to be searched, including the exteriors and

 

 1In Caggiano, the informant was a former drug user who
 
provided the names of occupants of the searched premises and the
exact dates of his visits. He reported that he observed fire-
arms, as well as glassine bags containing white powder which the
defendant had said contained cocaine. Caggiano, 899 F.2d at 101.
 

 4

interiors of the Taylor residences, noting in particular the 400

to 500 marijuana seedlings being raised in milk cartons and

crates at appellant's residence.

 Continuing with the "totality of the circumstances"

analysis mandated by Gates, we find no merit in appellant's
 

contention that Hutchings conducted an inadequate or superficial

follow-up investigation of the informant's tip. On the contrary,

Hutchings promptly set out to corroborate the informant's tip by

consulting official records relating to appellant's prior convic-

tions for marijuana trafficking. These records indicated that

appellant, five years earlier, admitted to another police officer

that she intentionally cultivated marijuana on the same property,

and later entered a guilty plea to a state trafficking charge.

An affiant's knowledge of the target's prior criminal activity or

record clearly is material to the probable cause determination.

See United States v. Asselin, 775 F.2d 445, 446 (1st Cir. 1985);
 

United States v. Sumpter, 669 F.2d 1215, 1222 (8th Cir. 1982).
 

Moreover, the issuing magistrate properly may credit the experi-

ence and pertinent expertise of a law enforcement affiant in

evaluating the authenticity of the informant's description of the

target's modus operandi. See United States v. Soule, 908 F.2d
 

1032, 1040 (1st Cir. 1990) (citing United States v. Ortiz, 422
 

U.S. 891, 897 (1975) ("[O]fficers are entitled to draw reasonable

inferences from [] facts in light of their knowledge of the area

and their prior experience . . . .")). In the present case, the

informant's detailed description of the location, manner and

 5

extent of the marijuana cultivation and the presence on the same

premises of an unusually large number of zip lock plastic bags,

cf. United States v. Desmarais, 938 F.2d 347, 352 (1st Cir. 1991)
 

(presence of plastic baggies supports reasonable inference of

intent to distribute marijuana and hashish found on same premis-

es), combined with Agent Hutchings' extensive experience as a law

enforcement officer in Maine,2 plainly buttressed the informant-

based indicia of probable cause. We accordingly conclude, based

on the totality of the circumstances, that the Hutchings affida-

vit provided a substantial basis for the issuing judicial offi-

cer's practical, common-sense finding that there was a fair prob-

ability that evidence of a crime would be found on appellant's

premises.

B. Admissibility of Pre-Miranda Admissions
 

 While a search team executed the warrant, Agent

Hutchings arrested appellant and placed her in the back seat of a

police vehicle. Hutchings testified that he gave appellant no

Miranda warnings because he did not intend to ask her any ques-
 

tions. At some point during the trip to the county jail, appel-

lant initiated conversation by asking: "Why is this happening to

me?" Hutchings replied: "You can't be growing dope on your

property like that." Taylor responded: "If you had waited and

come next week, you'd have only gotten half the plants that you

 

 2The Hutchings affidavit fully recited his credentials,
including his educational training and eleven years of experience
in drug-related cases.

 6

did[,] the way you do is you pull the male plants early." She

added that she was growing the marijuana plants for treatment of

a medical condition. As appellant was speaking, Hutchings turned

on the overhead light in the vehicle and, without stopping the

vehicle, wrote appellant's statements on a pad. Later, during

"booking" at the county jail, appellant spontaneously repeated

some of these statements to a deputy sheriff.

 Miranda warnings must be given before a suspect is
 

subjected to "custodial interrogation." United States v. Ma-
 

guire, 918 F.2d 254, 262 (1st Cir. 1990), cert. denied, 111 S.
 

Ct. 1421 (1991).3 "Interrogation" includes not only the asking

of direct questions but also means "any words or actions on the

part of police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to
 

elicit an incriminating response from the suspect." Rhode Island
 

v. Innis, 446 U.S. 291, 301 (1980) (emphasis added).4 Since
 

Hutchings' response to appellant's spontaneous inquiry was not

interrogative, we must determine whether it nevertheless consti-

 

 3The government does not deny that appellant was in "custo-
dy" during her conversation with Hutchings.

 4Unlike the present case, the issue in Innis was whether the
 
police had initiated "interrogation" after the defendant invoked
Miranda. Although the basic test for custodial "interrogation"
 
does not differ in the pre-Miranda context, courts should be
 
particularly alert to the presence of subtle declarations and
conduct by the police, such as those challenged in Innis, because
 
an unwarned defendant may be less alert to her rights or to the
risks of "volunteered or spontaneous" admissions.

 7

tuted the "functional equivalent." Id. at 302.5
 

 Appellant argues that Hutchings intended to elicit an

incriminating statement en route to the county jail. As evi-

dence, she points to Hutchings' own testimony that suspects often

engage in conversation or general banter while being transported

to jail. More pointedly, she asserts that, when Hutchings'

expectation was confirmed by appellant's inquiry, he deliberately

narrowed his response by referring directly to the criminal

charge for which appellant had just been arrested.

 The "functional equivalence" test does not turn on the

 

 5The government insists that the district court ruling that
the Hutchings response did not constitute custodial "interroga-
tion" is subject to "clear error" review only. Normally, "clear
error" is the standard employed in reviewing findings of fact.
See United States v. Falon, 959 F.2d 1143, 1146-47 (1st Cir.
 
1992); United States v. Sanchez, 943 F.2d 110, 112 (1st Cir.
 
1991). In the present case, however, none of the relevant facts
are in dispute. Hutchings alone testified at the motion hearing,
conceding that appellant was not given Miranda warnings and that
 
the in-transit conversation occurred. Thus, the determination as
to whether police "interrogation" occurred depends on the totali-
ty of the circumstances, a balancing analysis commonly considered
amenable to plenary review. See, e.g., United States v. Calisto,
 
838 F.2d 711, 717-18 (3d Cir. 1988); United States v. Poole, 794
 
F.2d 462, 465 (9th Cir. 1986) (holding that, absent factual
dispute, totality test "requires us to 'consider legal concepts
in the mix of fact and law and to exercise judgment about the
values' underlying the Miranda rule and the fifth amendment")
 
(citation omitted). Indeed, the need for a heightened standard
of review seems implicit in some of the seminal "interrogation"
cases. See, e.g., Arizona v. Mauro, 481 U.S. 520, 528-29 n.6
 
(1987) (reversing "interrogation" determination by state supreme
court, and challenging dissent's assertion that court improperly
disregarded factual findings: "[The] facts of this case do not
present a sufficient likelihood of incrimination to satisfy the
legal standard articulated in Miranda v. Arizona and in Rhode
 
Island v. Innis.") (emphasis added); Innis, 446 U.S. at 303
 
(vacating judgment of state supreme court, noting that "[i]t is
our view ['of the facts of the present case'], therefore, that
 
the respondent was not subjected [to 'interrogation'].") (empha-
sis in original).

 8

subjective intent of the particular police officer but on an

objective assessment as to whether the police statements and

conduct would be perceived as interrogation by a reasonable

person in the same circumstances. See Arizona v. Mauro, 481 U.S.
 

520, 527 (1987); Innis, 446 U.S. at 301-02 n.7; cf. United States
 

v. Soto, 953 F.2d 263, 265 (6th Cir. 1992) (noting that the
 

"[a]bsence of intent to interrogate, while not irrelevant, is not

determinative of whether police conduct constitutes interroga-

tion"). Although a different result might obtain were it estab-

lished that the challenged police conduct was designed to elicit
 

a response, see United States v. Vazquez, 857 F.2d 857, 863 (1st
 

Cir. 1988) (quoting Innis, 446 U.S. at 302 n.7), the mere fact
 

that a police officer may be aware that there is a "possibility"

that a suspect may make an incriminating statement is insuffi-

cient to establish the functional equivalent of interrogation.

Mauro, 481 U.S. at 528-29.
 

 Hutchings testified that he "might have anticipated

that [appellant] would make some sort of statement in response to

what [he] said," but because the entire conversation was so

abruptly initiated by Taylor, and so transitory, he "wasn't

thinking of what her next sentence was going to be or what she

was even thinking." Tr. at 38-39. We think Hutchings' conduct

indicates no premeditated or deliberate design, but evidences, at

most, Hutchings' awareness that appellant might continue the

conversation she spontaneously initiated. See, e.g., Innis, 446
 

U.S. at 303 (noting that police comments were part of "brief

 9

conversation" containing "a few offhand remarks"); Plazinich v.
 

Lynaugh, 843 F.2d 836, 840 (5th Cir. 1988) (noting brevity and
 

informality of officer's statement to defendant as evidence of

lack of "interrogation"), cert. denied, 488 U.S. 1031 (1989).6
 

 Nor can we agree that Hutchings' answer unresponsively

"narrowed" appellant's inquiry, or designedly channeled her

attention toward dangerous waters. Viewed objectively, appel-

lant's initial inquiry ("Why is this happening to me?") was a

direct request for an explanation as to why she was under arrest.
 

Appellant would have us propound a rule that police officers may

not answer direct questions, even in the most cursory and respon-

sive manner. It might well be argued, however, that an officer's

refusal to respond to such a direct question in these circum-

stances would be at least as likely to be perceived as having

been intended to elicit increasingly inculpatory statements from

a disconsolate suspect arrested moments before. Although we do

not rule out the possibility that "interrogation" might occur as

a consequence of a police officer's response to, or relentless

pursuit of, this type of inquiry in other circumstances, cf.,
 

e.g., Harryman v. Estelle, 616 F.2d 870, 874 (5th Cir.) (relevant
 

inquiry is whether officer's statement of "surprise," however

posed, "could reasonably have had the force of a question")
 

 

 6Appellant points to the presence of a writing pad in the
vehicle, as further evidence of premeditation. The availability
of writing materials in a police vehicle is more reasonably
explained by the routine demands of law enforcement work.
Without more, the presence of these materials formed an insuffi-
cient basis for the proposed inference of premeditation.

 10

(emphasis added), cert. denied, 449 U.S. 860 (1980), in the
 

present case appellant's inquiry was entirely spontaneous and

the officer's answer was cursory and directly responsive. See
 

United States v. Jackson, 863 F.2d 1168, 1172 (4th Cir. 1989)
 

(finding no "interrogation" where police officer responded to

direct inquiry regarding reasons for defendant's arrest, made

during conversation initiated by defendant); United States v.
 

Crisco, 725 F.2d 1228, 1232 (9th Cir.) (holding that police
 

officer's informational response to defendant who expressed

general "bewilderment" at arrest was not "interrogation"), cert.
 

denied, 466 U.S. 977 (1984); cf. Arizona v. Roberson, 486 U.S.
 

675, 687 (1988) (noting that, after defendant invokes Miranda
 

rights, there is no "interrogation" if police merely "inform"

defendant about an investigation of a second offense of which he

is suspected).

 We thus conclude that appellant's statement was not the

product of custodial interrogation. Miranda v. Arizona, 384 U.S.
 

436, 478 (1966) ("Volunteered statements of any kind are not

barred by the Fifth Amendment . . .").7

C. Rational Basis for Drug Equivalency Ruling
 

 The district court applied the drug equivalency stan-

dard prescribed in U.S.S.G. 2D1.1(c): "in the case of an

offense involving marijuana plants, if the offense involved 50 or

 

 7We note that appellant made substantially the same spon-
taneous admissions later at the county jail, even though the
"booking" officer posed only routine "booking" questions.

 11

more plants, [the court should] treat each plant as the equiva-

lent of one kilogram of marijuana." Consequently, appellant was

sentenced to ninety-nine months' imprisonment (offense level 28,

criminal history category II), based on the 661 marijuana plants

seized in and around her residence.

 Appellant claims that section 2D1.1(c) is arbitrary and

without a rational empirical basis; hence its application vio-

lates due process. She relies on expert testimony presented in

the case of United States v. Osburn, 756 F. Supp. 571 (N.D. Ga.
 

1991), to the effect that it is impossible to cultivate a mari-

juana plant whose yield would exceed one kilogram of marijuana.

 We disagree with appellant that the equivalency stan-

dard is arbitrary. Congress reasonably may opt for a punitive

deterrent against large-scale marijuana manufacturing operations

which pose a greater threat than small-scale operations, and

warrant exponentially enhanced punishment. See United States v.
 

McMahon, 935 F.2d 397, 401 (1st Cir. 1991) ("'Congress intended
 

to punish growers of marihuana by the scale or potential of their
 

operation and not just by the weight [or size] of the plants

seized at a given moment.'") (citation omitted); see also United
 

States v. Jordan, 964 F.2d 944, 947 (9th Cir. 1992); United
 

States v. Holmes, 961 F.2d 599, 601 (6th Cir. 1992); United
 

States v. Motz, 936 F.2d 1021, 1025-26 (9th Cir. 1991).8 Even
 

 

 8Whatever precedential weight Osburn had was withdrawn on
 
direct appeal. See United States v. Osburn, 955 F.2d 1500 (11th
 
Cir. 1992). To our knowledge, no other court has held 2D1.1(c)
unconstitutional on the empirical ground asserted by appellant.
In reversing the district court, the Eleventh Circuit held that

 12

were we to conclude, however, that empirical evidence could

undermine the constitutionality of 2D1.1, a conclusion we need

not consider, appellant not only failed to present evidence in

support of such a claim but her borrowed empirical support has

vanished.9 The district court's application of U.S.S.G. 2D1.1

did not constitute error.

 Affirmed.
 Affirmed
 

 

neither Congress nor the Commission intended the 2D1.1 equiva-
lency test as a predictor of the maximum yield of a marijuana
plant. Id. at 1507-08. Rather, the actual weight of the con-
 
trolled substance derived from any maturing plant was recognized
as largely speculative, whereas a non-equivalency rule would
 
"reward" a marijuana grower for the mere fortuity that her arrest
occurred early in the growing season. Id. at 1506.
 

 9The expert who testified in Osburn conceded later that he
 
had since cultivated a marijuana plant whose actual yield (1152
grams) exceeded the drug equivalency rate adopted in 2D1.1.
United States v. Godwin, 779 F. Supp. 561, 565 (N.D. Fla. 1991).
 

 13