MAGGIE JO KOZA, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 15799

May 1, 1986                                    718 P.2d 671

*Helen I. Jones,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City, *Robert Miller,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

On November 5, 1980, Maggie and Joe Koza were arrested and charged with conspiracy to commit robbery. Subsequently they were also charged with the murder of a Las Vegas taxi cab driver. Joe Koza was convicted of that murder and his conviction was upheld by a decision of this court in Koza v. State, 100 Nev. 245, 681 P.2d 44 (1984). This appeal concerns Maggie's murder conviction for her role in that slaying. The only issue we need address is the admissibility of Maggie's November 7, 1980, custodial statements.[1]

At approximately 11:00 a.m., the morning after her arrest, Maggie was taken from the Clark County Jail Annex to the Las Vegas Metropolitan Police Department's Detective Bureau. At that time she was advised of her rights as required by Miranda v. Arizona, 384 U.S. 436 (1966).

The detectives informed Maggie that she was a suspect in a murder unrelated to the one in the instant appeal. Maggie then asked that she be permitted to speak with her husband before discussing any murders. (At that time Joe Koza was in Southern Nevada Memorial Hospital being treated for drug withdrawal and a related infection.) The detectives ceased their questioning of Maggie and returned her to the jail. They then proceeded to the hospital to interview Joe. Joe Koza told the detectives that he and Maggie each had a $500.00 per day heroin and cocaine habit. Joe refused to discuss the charges against him and requested to speak with attorney John Momot. The detectives then returned to the detective bureau and tried unsuccessfully to contact Momot.

At approximately 2:00 p.m. the detectives brought Maggie back to the detective bureau and arranged a telephone conversation between the Kozas. After talking with her husband, Maggie told the detectives that she would also like to speak with attorney

---

[1]Because our disposition of this appeal turns on this single issue, the reader is referred to *Koza v. State,* above, for details of the crime.

Momot. The detectives did not question her further but left her handcuffed to a rail in the interrogation room.

Momot arrived at the detective bureau at approximately 4:45 p.m. When Momot completed his conference with Maggie she was returned to the jail. Momot testified that he told the detectives that he did not know if he would be representing both the Kozas or only Joe, that no determination had been made but that for the time being he represented them both. He also told the police that he had advised Mrs. Koza not to talk with them.

The detectives next spoke with Maggie on the following morning, November 7. The detectives first returned to the hospital to see Joe; however, he refused to speak to them. One of the detectives then telephoned Momot to "verify" that Koza was asserting his right to counsel. According to that detective Momot told him that they were not to question Joe and that he was not going to represent Maggie. Momot testified that he did not tell the detectives until several days later on November 11 that he would not be representing Maggie.

The detectives left the hospital and returned to the detective bureau where they once again brought Maggie to the interrogation room. The detectives claimed that Maggie was only returned to the interrogation room so that they could "rebook" her for the murder involved in the instant appeal. After again advising her of her rights the detectives advised Maggie that they had evidence against her in connection with an additional murder and that she would be charged with that crime. They then proceeded to detail the evidence they claimed to have against her, namely, a palm print and the results of a ballistics test. According to one of the detectives, Maggie then stated: "I knew it was coming. I knew the horse was going to kick, and it hurts." She then spoke for about an hour, detailing three separate murders which she stated that she and her husband were responsible for. Maggie agreed to give a "formal" statement to the detectives but wanted to speak with her husband first. The detectives arranged for a phone call; however, after speaking with her husband, Maggie refused to talk to the police any further. She was then returned to her jail cell.

The district court ruled that the statements made by Maggie were made after a voluntary, knowing and intelligent waiver of her fifth, sixth and fourteenth amendment rights. Such is not the case; so we reverse.

To determine whether there has been a proper waiver of right to counsel the court must separately focus on whether the waiver was voluntary and whether it was knowingly and intelligently made. Edwards v. Arizona, 451 U.S. 477 (1981). The United States Supreme Court has noted that the right to counsel is a "prime example of those rights requiring the special protection of

the knowing and intelligent waiver standard." *Edwards* at 483, citing Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). *See also* Tomarchio v. State, 99 Nev. 572, 665 P.2d 804 (1983).

Once an accused has asserted the right to counsel, all interrogation must cease until an attorney is present. Miranda v. Arizona, 384 U.S. 436 (1966). In *Edwards,* above, the United State Supreme Court held that it was "inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485. Waiver of that right is not established by a showing that the accused was once again advised of his rights:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484, 485 (footnote omitted).

In a recent decision, Michigan v. Jackson, 54 U.S.L.W. 4334 (1986), the United States Supreme Court discussed and applied the principle of *Edwards v. Arizona* to a situation in which two defendants requested appointment of counsel at separate arraignments. Before the defendants had had an opportunity to consult with counsel, police officers, after advising the defendants of their Miranda rights, questioned them and obtained written waivers of rights and confessions. The Supreme Court noted that under *Edwards* once a suspect has invoked his right to counsel, the police may not initiate interrogation until counsel has been made available to the suspect. Quoting *Edwards,* for the proposition that "the assertion of the right to counsel [is] a significant event," the Court in *Michigan* held that a waiver of rights was invalid where the defendant's assertion of the right to counsel had not been honored.

If there could have been any doubt about the meaning of *Edwards* such a doubt was removed by the reaffirmation and expansion of the *Edwards* ruling in *Michigan.* There is no way in which this court can hold the interrogation here to be valid.

The impermissible "further interrogation" prohibited by *Edwards* and *Michigan* need not, of course, take the form of a question and answer session. In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court held that "techniques of persuasion" other than questioning may amount to interrogation.

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. at 301, 302 (emphasis partially supplied; footnotes omitted).

Maggie Koza was first interrogated on the morning of November 6. After talking with her husband, Maggie told the detectives that she did not want to talk to them and wanted instead to talk to attorney Momot. The next day, November 7, the detectives took Maggie back to the interrogation room in the detective bureau. The detectives testified that this was not done to interrogate Maggie, but rather to "rebook" her on the murder charge. The detectives admitted that it was not necessary to the "rebooking" that they return Maggie to the interrogation room. There was testimony by others that Maggie said that she did not want to go with the detectives. The lower court expressly found that there was "no doubt" that a jail matron told Maggie that she had to go with the detectives.

Once Maggie was confined in the interrogation room the detectives read her her rights and told her that she was under arrest for murder. Maggie refused to sign a rights waiver. They then explained to her that ballistics tests on a gun found in the motel room where she was originally arrested had revealed that the gun positively matched a bullet removed from the victim. They also told her that her fingerprints had been identified on the victim's

taxi. At that point she made the incriminating statements which are the subject of this appeal.

It is immediately apparent that the detectives' contact with Maggie on the 7th of November constituted an interrogation within the meaning of *Rhode Island v. Innis,* above. Focusing on the perception of Maggie, rather than the intent of the police, as *Innis* requires, we see that Maggie was told that she had to go with the detectives. She was placed in an interrogation room where she had spent several hours the day before. The detectives not only told her she would be charged with murder, they also detailed part of the evidence against her, an act obviously beyond the necessities of any "rebooking." From the perspective of a suspect in Maggie's position it would be apparent that the detectives were hoping to elicit a statement. Certainly the officers should have known that their comments and actions were "reasonably likely to elicit an incriminating response." *Innis* at 301.

The Supreme Court of Delaware has very recently addressed a factual scenario similar to the one now at bar. In Wainwright v. State, 504 A.2d 1096 (1986), the defendant had invoked his right to counsel. Subsequently, while being booked, a police officer told the defendant that he was being charged because a co-defendant had made a statement implicating him. Forty-five minutes later the defendant made to the officers a statement which was used against him at his trial. The Delaware Supreme Court characterized the police officer's comments about the evidence against the defendant as "a gratuitous and totally unnecessary tactic which was reasonably calculated to elicit a reaction from the defendant." 504 A.2d at 1103. The Delaware court went on to hold that "[a]ny attempt to 'spark' a statement in the absence of counsel through presentation of evidence will contaminate the waiver." 504 A.2d at 1103.

Because the instant interrogation and consequent statement resulted from police initiative and not at the instance of Maggie, *Edwards v. Arizona,* above, requires that her statements be suppressed if she had previously invoked her right to counsel. The lower court ruled that the *Edwards* doctrine does not apply to Maggie because she was not represented by counsel. That ruling was erroneous as *Edwards* does not turn on the employment of counsel, but rather on the invocation of the right to counsel. *Edwards,* above.

There is no dispute that Maggie demanded to speak to attorney Momot on November 6. The testimony was conflicting as to when Momot told the detectives that he was not going to represent Maggie; Momot said it was on the 11th and they said it was

on the 7th, immediately before Maggie was brought back to the interrogation room. Two things are certain: Maggie was not informed on the 7th that Momot was not going to represent her, and although she had requested counsel, she was not provided another attorney until November 12, 1980.

As *Edwards v. Arizona* holds, it is no saving grace to a police-initiated interrogation that the accused is once again read his or her rights if the accused has already invoked the right to counsel. Once invoked, that right must be scrupulously honored. In the instant case it is apparent that Maggie invoked her right to counsel on the 6th. Attorney Momot expressly told the detectives that Maggie had been advised not to speak to them. Whether the detectives knew on the 7th that Momot would not be representing Maggie is irrelevant because, either way, she had invoked her right to counsel and their actions violated that right. The withdrawal of particular counsel does not constitute a waiver of the right to counsel. As the United States Supreme Court stated in Maine v. Moulton, 54 U.S.L.W. 4039 (1985), "Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance." 54 U.S.L.W. 4042 (footnote omitted).

The burden of proving waiver by a preponderance of the evidence is on the state. North Carolina v. Butler, 441 U.S. 369 (1979); Brimmage v. State, 93 Nev. 434, 567 P.2d 54 (1977). Because the finding of waiver in this case is clearly not supported by the record the lower court's refusal to suppress Maggie's November 7, 1980, statements was error and must be reversed. *See Tomarchio v. State*, above.

Accordingly, the judgment of the district court is reversed and this matter is remanded for further proceedings consistent with this opinion.