Bruce NELSON, P–8315

v.

Thomas A. FULCOMER, et al.

Appeal of Bruce NELSON.

No. 88–3828.

United States Court of Appeals, Third Circuit.

Argued Jan. 30, 1990.

Decided Aug. 17, 1990.

George E. Schumacher, Federal Public Defender, Thomas S. White (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

Robert E. Colville, Dist. Atty., Matthew L. Witherel (argued), Asst. Dist. Atty., Pittsburgh, Pa., for appellee.

Before STAPLETON, and MANSMANN, Circuit Judges and KOSIK, District Judge *.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Petitioner Bruce Nelson was convicted in Pennsylvania state court of rape and murder. In his habeas corpus petition, Nelson contends that the trial court impermissibly admitted into evidence his inculpatory response to a police-engineered confrontation with his alleged partner in crime, Terrence Moore. The district court dismissed Nelson's petition, holding that the behavior of the police did not violate the prophylactic rules set out in the Supreme Court's Fifth and Sixth Amendment jurisprudence and that Nelson's remark was voluntary and thus admissible. We cannot discern from the state and district court record certain facts we deem critical to resolving Nelson's constitutional claims. Accordingly, we will reverse the district court's decision and remand for additional fact-finding consistent with this opinion.

## I.

In response to questioning by Pennsylvania homicide detectives, Terrence Moore confessed to participating in the rape and murder of Corrine Donovan. In his confession, Moore alleged that Bruce Nelson, the petitioner, initiated both crimes. The detectives then decided to confront Nelson with Moore's confession. That confrontation is the focus of this case. The most comprehensive findings of fact with respect to that confrontation are found in the state trial court's post-trial opinion:

* Honorable Edwin M. Kosik, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

On November 27, 1981, Moore was interviewed by various police officers concerning the rape, robbery, and murder of the victim. After a period of time, Moore admitted his involvement in the crimes and implicated the defendant [Nelson]. The defendant, who was in the Allegheny County jail on other charges, was transported to the Public Safety Building for questioning on these charges. Prior to questioning, the defendant was given his Miranda warning and executed a written waiver of his right to counsel. Both the defendant and the co-defendant were questioned by the police officers separately. However, the defendant expressed a desire to remain silent. After Moore confessed and implicated the defendant in the crimes, the police officers asked Moore to go into the room alone where the defendant was located and to tell him (the defendant) what he had done. During the confrontation between the defendant and Moore the following exchange occurred:

Def: "How much did you tell them?"
Moore: "I told it all."

The defendant then asked that Moore be removed from the room. Thereafter, Moore informed the police about what the defendant had said.

Appendix for Appellant ("App.") at 619. Shortly after this confrontation, Nelson was arrested for the rape and murder of Corrine Donovan.

At trial, virtually all of the evidence offered against Nelson was supplied by Moore, who gave the following testimony. Nelson and Moore stole a van and drove to a parking garage in the hopes of committing a theft. When Corrine Donovan walked into the garage, Nelson accosted her and forced her back to the van. Nelson then raped Donovan and encouraged Moore to do the same. Moore refused at first but then followed suit. After Moore finished, Nelson climbed on top of Donovan again. When Moore next looked over, Nelson had a knife in his hand and was strangling Donovan with a piece of cloth. After Nelson stopped choking Donovan, the two left her body on the floor of the garage and

fled. Moore abandoned the stolen van the following morning.

According to expert testimony at trial, Moore's fingerprints were found on Donovan's purse and on her parking garage ticket. Forensic examination of the victim revealed saliva on her breast and bra that was consistent with Moore's blood type. Saliva on a cigarette butt found at the crime scene was also consistent with Moore's blood type, and hairs found in several different places on the victim and her garments matched Moore's type of hair. Nelson's fingerprints were not found at the scene and all of the saliva and hair samples found on the victim were inconsistent with Nelson's characteristics.

At the conclusion of the bench trial, the judge found Nelson guilty of the charges against him. Nelson received a life sentence for the murder. For the rape, Nelson was sentenced to ten to twenty years in prison, to run concurrently with the life sentence.

In its post-trial motions opinion, the trial court expressly rejected Nelson's claim that the Constitution compelled the suppression of his response to the confrontation with Moore. Though the court did not articulate the precise nature of Nelson's challenge, it highlighted that Nelson had not been charged or arrested at the time of the questioning and that his inculpatory statement "was not in response to any question posed by the police or Moore." App. at 620. In light of those facts, the state court held that the admission of Nelson's statement violated neither the United States nor the Pennsylvania Constitution.

The opinion of Pennsylvania's Superior Court sounded a similar theme:

No constitutional rights of the appellant were violated when the appellant volunteered the question to Moore: "How much did you tell them." A statement which is spontaneously volunteered is admissible notwithstanding a prior assertion of constitutional rights. The Commonwealth has conceded that the police sought to confront the appellant with Moore's confession. However, there is no prohibition against the police con-

fronting a suspect with incriminating evidence and doing so does not necessarily render his statement involuntary.

App. at 679–680 (citations omitted). The Pennsylvania Supreme Court declined to review the case.

In his habeas corpus petition, Nelson reiterates his arguments that the confrontation with Moore violated the prophylactic rules set out in the Supreme Court's Fifth and Sixth Amendment jurisprudence. The magistrate recommended that Nelson's claims be rejected on two grounds. First, he reasoned that Nelson could not rely on the Sixth Amendment "jail plant" line of cases because Moore was not a paid, undisclosed informant. Second, the magistrate observed that Nelson had asked the inculpatory question "without being prompted" and held, under *Kuhlman v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), that this spontaneously-made statement was properly admissible notwithstanding a prior assertion of the right to remain silent. App. at 793–94.

The district court declined to adopt the magistrate's report and recommendations, but nevertheless denied Nelson's habeas corpus petition and his certificate of probable cause for appeal. It wrote no opinion explaining this result. We granted Nelson's probable cause petition and now review Nelson's claims de novo. We have jurisdiction under 28 U.S.C. § 1291.

The parties tender four issues on appeal: (1) whether the state court's finding of fact that Nelson invoked his right to cut off questioning is "fairly supported by the record," 28 U.S.C. § 2254(d)(8); (2) if so, whether the confrontation between Nelson and Moore violated the Fifth Amendment's restrictions on custodial interrogation of suspects who have invoked their right to silence; (3) whether the police nevertheless "scrupulously honored" Nelson's right to silence under *Michigan v. Mosley*, 423 U.S.

96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); and (4) whether the confrontation violated Nelson's Sixth Amendment right to counsel.

## II.

In this appeal, the Commonwealth argues for the first time that the state court's factual finding that Nelson invoked his right to remain silent is not fairly supported by the state court record.

The state court record before us, which has not been established as complete, contains only one reference to Nelson's invocation of his right to remain silent other than the trial court's finding to that effect. During the trial court's hearing on Nelson's post-trial motions, the Commonwealth's counsel made the following statements:

MR. BENSON: Your Honor, on December 10 of 1982, an order and brief memorandum filed by this Court bearing upon this issue found, as a matter of fact, three things; that the defendant was not under arrest at the time of this statement, that he was not charged with these offenses at the time of this statement, and that he had previously made a valid waiver of his right to counsel.

The pre-interrogation warning form, and I'm not certain if that was admitted into evidence or not, Your Honor, but it indicates that the defendant had been informed of his Miranda warnings, signed the card indicating he understood them, and signed the waiver card indicating he did not want to talk to the police.

App. at 560. Immediately thereafter counsel acknowledged the correctness of the court's finding that Nelson "did not want counsel, but did not want to talk to the police." App. at 561. The Commonwealth concedes that the record contains nothing that directly contradicts the finding that Nelson sought to cut off questioning.[1]

---

1. In its appellate brief, the Commonwealth notes that one of the trial court's pre-trial opinions discusses Nelson's motion to suppress but fails to make a finding that Nelson invoked his right to silence. App. at 176–77. Based on this lacuna, the Commonwealth contends there was never any showing that such an invocation occurred. It is undisputed, however, that the same judge who wrote the opinion on which the Commonwealth relies later found that Nelson invoked his right to silence; the absence of a reference to the invocation in the pre-trial opinion does not contradict the later explicit finding that Nelson had asked to cut off questioning.

Thus, the Commonwealth essentially argues that we should reject an uncontradicted factual finding of the state court which the Commonwealth's own attorney unambiguously corroborated during the state trial proceedings. We decline to do so.

■ Subsections (d) and (e) of Section 2254 of Title 28 create a presumption in favor of state court findings of fact under designated circumstances. While those subsections do not literally apply here because it is the respondent who is challenging a state court finding and because the record does not affirmatively establish that a suppression hearing was held, those statutory provisions reflect a clear congressional policy favoring deference to state findings of fact absent good cause for rejecting such findings. Given the Commonwealth's express acknowledgement before the trial court that Nelson attempted to cut off questioning and its failure to point to any record evidence contradicting this concession, we conclude that no good cause exists for rejecting the trial court's finding and, accordingly, accept that finding.

■ Moreover, even if the record did not fairly support the state court's finding, it is clear that the Commonwealth failed to make this argument before the magistrate or the district court and therefore waived its ability to raise it on appeal. *See Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir.1976) ("We generally refuse to consider issues that are raised for the first time on appeal.... [Only] in horrendous cases where a gross miscarriage of justice would occur [should] the practice ... be relaxed."). Nelson unambiguously claimed in his habeas corpus petition that the police had violated his Fifth Amendment rights by interrogating him after he had invoked his right to remain silent. It was therefore incumbent upon the Commonwealth to argue before the magistrate or district court that reliance on the state court's finding that Nelson had invoked his right was not justified. While we would hesitate to find a waiver in a habeas corpus case where such a finding would work a substantial injustice, this is not such a case.

Having accepted the fact that Nelson sought to cut off questioning, we now proceed to consider whether the ploy of confronting him with Moore violated *Miranda*'s prohibition against further interrogation and, if so, whether it was consistent with *Michigan v. Mosley*'s requirement that the police "scrupulously honor" Nelson's request.

### III.

■ Under *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966), "[i]f [a suspect] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." If the state violates this rule, the prosecution may not use a suspect's responses to the custodial interrogation in its case-in-chief. *See, id.* at 444, 86 S.Ct. at 1612; *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (permitting admission of statements taken in violation of Fifth Amendment prophylactic rules to impeach defendant's conflicting testimony). Custodial interrogation encompasses not only direct questioning by the police, but also its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

The Supreme Court's decision in *Rhode Island v. Innis*, elaborates on *Miranda*'s proscription of the "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The suspect in *Innis* had been arrested for robbing a cab driver with a sawed-off shotgun. When apprehended, however, the suspect was unarmed. At the time of the arrest, the police immediately read the suspect his *Miranda* rights and the suspect responded that he understood his rights and wished to speak with an attorney. A police captain instructed three patrolmen to transport the suspect to the police station and admonished them not to question or coerce the suspect in any way. During the trip, however, the officers conversed with each other about the possibility of a handicapped child finding the shotgun and killing her-

self. The suspect then interrupted and led the patrolmen to the gun.

In deciding whether the patrolmen's conversation violated *Miranda*'s prohibition against interrogation, the Court first noted that many of the police practices criticized in *Miranda* did not include express questioning:

> For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution. The Court in *Miranda* also included the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society."

*Id.* at 299, 100 S.Ct. at 1689 (citations omitted). In order to protect suspects from these ploys, the Court in *Innis* interpreted *Miranda*'s prohibition against interrogation to bar not only express questioning, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. Applying that standard to the facts before it, the Court concluded that the patrolmen's conversation was not interrogation because the police had little or no reason to believe that the off-hand, indirect appeal to the suspect's conscience would inspire an inculpatory response.

The Supreme Court recently reaffirmed *Innis'* definition of interrogation in *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). In that case, the respondent, Mauro, was taken into po-

lice custody after he freely admitted to killing his son. Once at the police station, however, Mauro indicated that he did not want to answer any questions without his lawyer. Shortly thereafter, Mauro's wife, who was also a suspect, insisted that she speak with her husband. The police assented to the request after both Mauro and his wife agreed that the conversation take place in the presence of an officer. During their brief conversation, Mauro told his wife not to answer any questions without his lawyer. At trial, the prosecution offered Mauro's remark to rebut his defense of insanity. The trial court denied Mauro's motion to have the remark suppressed.

The Supreme Court affirmed on the ground that Mauro's confrontation with his wife was not the "kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," *id.* at 527, 107 S.Ct. at 1936:

> [T]he weakness of Mauro's claim that he was interrogated is underscored by examining the situation from his perspective. We doubt that a suspect, told by officers that his wife will be allowed to speak with him, would feel he was being coerced to incriminate himself in any way.... Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation.

*Id.* at 528–29, 107 S.Ct. at 1936 (citations omitted). Though the Court concluded that the facts before it did not satisfy the *Innis* test, Justice Stevens warned that "[i]t is undisputed that a police decision to place two suspects in the same room and then listen to or record their conversation may constitute a form of interrogation even if no questions are asked by any police officers." *Id.* at 535, 107 S.Ct. at 1939 (Stevens, J., dissenting).

We now turn to whether the confrontation between Nelson and Moore violated *Innis'* prohibition against the use of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should

know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1689–90. Because that inquiry is contextual, we review the known facts. *See United States v. Mesa,* 638 F.2d 582, 584 (3d Cir.1980) ("[T]he determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis."). Nelson invoked his right to cut off questioning, thereby triggering *Innis*'s prohibition against further interrogation. In response, the police contrived to confront Nelson with Moore and the confession in order to elicit an incriminating response. Toward that end, the police asked Moore to tell Nelson he had confessed and had implicated Nelson in the rape and murder. Moore agreed and was taken to Nelson's interrogation room. Some time thereafter, Nelson uttered the remark in question: "How much did you tell them?"[2] The crucial inquiry is whether the confrontation occurred in the manner intended by the police and, if so, whether they should have expected their ploy to work.

What we do not know, and what we deem critical to resolving this case, is what Nelson was told *before* he posed the inculpating question. The trial court described the question as having been asked "during the confrontation." Its post-trial opinion adds that "[t]he statement made by the defendant was not in response to *any question* posed by the police or Moore." App. at 620 (emphasis added). The magistrate, relying solely on the comments of the trial judge, stated that Nelson made his incriminating remark "without being prompted." App. at 791. None of these comments illuminates what, if anything, Nelson had been told before he asked his incriminating question. While one can draw an inference

from Nelson's question itself that he spoke after being advised that Moore had confessed, that inference is not a necessary one. Nelson may simply have assumed from the surrounding circumstances that Moore had been interrogated and had confessed.

■ The peculiar importance of whether Nelson had been advised of the existence of a confession, by the police or by Moore at their bidding, follows from *Innis*'s definition of interrogation. Confronting a suspect with his alleged partner and informing him that his alleged partner has confessed is very likely to spark an incriminating response from a suspect if that suspect is in fact guilty. Accordingly, we conclude that if the police, or Moore at the police's instruction, had already confronted Nelson with the confession, then this case falls squarely under *Innis*'s prohibition of ploys reasonably likely to elicit an incriminating response. On the other hand, if Nelson had not been informed of the confession by the words or conduct of Moore or the police, then suppression of the remark was not required; we cannot say that merely placing a suspect in the same room with his partner in crime, without *any* additional stimulus, is reasonably likely to evoke an incriminating response. We explain both of these conclusions below.

Assume first that either the police, or Moore at the behest of the police, had already informed Nelson about the confession when he made the incriminating remark. *Innis* tells us that the fact that the police intended to elicit incriminating information, though not dispositive, suggests that they should have known a particular ploy was reasonably likely to succeed. The

---

2. Detective Freeman, one of the officers investigating Donovan's rape and murder, supplied the only trial testimony concerning the confrontation:

> Q: Once you got Nelson in custody did there come a time when you placed Moore and Nelson together?
> A: Yes
> Q: Were you present when that was done?
> A: Yes

Q: When you placed them together what if anything did the Defendant, Mr. Nelson, say to Mr. Moore? [Nelson's counsel objects]
A: Mr. Moore asked Mr. Nelson how much did you tell them.
Q: And what if anything did Mr. Moore reply?
A: And Mr. Moore said I told it all. And then Mr. Moore asked Nelson to tell his part in it, and Nelson asked that Moore be taken from the room.
App. at 441.

Court reasoned that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." 446 U.S. at 301–02 n. 7, 100 S.Ct. at 1690 n. 7.

The ploy of confronting a suspect with his or her alleged partner in crime and claiming that the partner has confessed is indistinguishable from the types of police practices explicitly criticized in *Miranda* and *Innis*. First, both of those decisions decry the use of coached witnesses to identify a suspect from a line-up. *Miranda*, 384 U.S. at 453, 86 S.Ct. at 1616; *Innis*, 446 U.S. at 299, 100 S.Ct. at 1688. Though this case does not involve a line-up, the confrontation with the partner in crime and his confession accomplishes the same task; in both cases, a witness identifies the suspect as the perpetrator of the crime at issue. We fail to see why the fact that the coached witness also happens to be the suspect's partner in crime makes the ploy any less violative of the suspect's rights.[3] Second, *Miranda* and *Innis* also admonish against "positing the guilt" of the suspect. *Miranda*, 384 U.S. 453, 86 S.Ct. at 1616; *Innis*, 446 U.S. at 299, 100 S.Ct. at 1688. While we do not know whether any information conveyed to Nelson included the fact that Moore's confession identified Nelson as an accomplice, from Nelson's perspective under the circumstances of this case, being advised of the existence of a confession was the functional equivalent of the police positing his guilt.

We therefore conclude that confronting a suspect with his alleged partner in crime and the fact that the partner has confessed is precisely the kind of psychological ploy that *Innis*'s definition of interrogation was designed to prohibit.[4] In so holding, we are mindful that courts have not spoken uniformly in this area of the law. Several courts, including two courts of appeals, have suggested that such a confrontation violates a defendant's Fifth Amendment rights. *See United States ex rel. Doss v. Bensinger*, 463 F.2d 576 (7th Cir.), *cert. denied*, 409 U.S. 932, 93 S.Ct. 239, 34 L.Ed.2d 186 (1972); *United States v. Barnes*, 432 F.2d 89 (9th Cir.1970); *Wainright v. State*, 504 A.2d 1096 (Del.Supr.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986); *State v. Uganiza*, 68 Haw. 28, 702 P.2d 1352 (1985); *Commonwealth v. Brant*, 380 Mass. 876, 406 N.E.2d 1021, *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980); *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973); *Commonwealth v. Hamilton*, 445 Pa. 292, 285 A.2d 172 (1971). At the same time, other courts have permitted the police to confront a suspect with his alleged partner's confession, though it bears noting that the great majority of these decisions pre-date *Innis*'s explicit prohibition against psychological ploys.[5] *See*

---

**3.** The fact that the coached witnesses in the fake line-ups were presumably lying, while Moore claimed to be telling the truth, does not weaken the analogy. If anything, the more inculpatory the evidence, the more likely it is to elicit an incriminating response.

**4.** While expressly advising the suspect that the accomplice's confession implicates the suspect exacerbates the situation, our conclusion would be the same even if Moore's confession had been disclosed in Moore's presence without this express advice.

**5.** *Shedelbower v. Estelle*, 885 F.2d 570 (9th Cir. 1989) (post *Innis & Mauro*) (after suspect had asked for an attorney, false assertion by police that victim had identified suspect did not amount to interrogation); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984) (post *Innis*); *Hill v. Whealon*, 490 F.2d

629 (6th Cir.1974); *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753 (1970); *State v. Welch*, 4 Or.App. 225, 476 P.2d 822 (1970); *Howell v. State*, 5 Md.App. 337, 247 A.2d 291 (1968), *cert. denied*, 396 U.S. 907, 90 S.Ct. 224, 24 L.Ed.2d 183 (1969).

Only the Ninth Circuit has attempted to reconcile the *Innis* test and the cases holding that the police do not "interrogate" when they confront suspects with highly incriminating testimony. In *United States v. Thierman*, 678 F.2d 1331, 1334 n. 3 (9th Cir.1982), the court suggested that, for instance, showing a defendant a picture of himself committing a bank robbery is a practice "normally attendant to arrest and custody" and therefore explicitly allowed under *Innis*. 446 U.S. at 301, 100 S.Ct. at 1689. We doubt that Court's reference to normal custody and arrest practices in *Innis* was intended to exempt ploys whose sole function was to convince the suspect to abandon his right to remain silent.

*United States v. Pena*, 897 F.2d 1075, 1081 n. 16 (11th Cir.1990) ("This practice of permitting interrogators to apprise a suspect of the evidence against him as a prelude to asking him to reconsider his decision to remain silent has been brought into doubt by *Rhode Island v. Innis*."); *Anderson v. Smith*, 751 F.2d 96 (2d Cir.1984) (expressing doubt as to continued vitality of these cases after *Innis*). We have found no post-*Innis* case in which a court has sanctioned confronting a suspect who has claimed his right to remain silent with his alleged partner and advising him at the same time of the existence of a confession by the partner. We think law enforcement agents should realize that this combination is particularly well calculated to produce incriminating remarks.[6]

The First Circuit's recent decision in *United States v. Vazquez*, 857 F.2d 857 (1st Cir.1988), merits special attention. In that case, the two defendants, Vazquez and Pizarro, were stopped and questioned by customs officials in Puerto Rico. Pizarro confessed to attempting to smuggle drugs shortly thereafter and was taken to the office of the customs supervisor. Vazquez, who had not confessed, was later brought to the same supervisor's office by different customs officials. Upon Vazquez' entrance, the two defendants burst into an exchange in which they made incriminating statements. The trial court denied the defendants' motions to have their comments suppressed.

The First Circuit affirmed, but noted the case was "difficult and close." 857 F.2d at 862. The court, citing *Arizona v. Mauro*, first concluded that simply placing two suspects in the same area need not satisfy *Innis*'s definition of interrogation. *Id.* Even though the court recognized that other facts made this a more troubling case than *Mauro*,[7] it nevertheless concluded

*See United States v. Monzon*, 869 F.2d 338 (7th Cir.) ("Routine booking questions are allowed because, to an objective observer, the questions are not 'designed to elicit an incriminating response."), *cert. denied*, — U.S. —, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

We also note that several courts have permitted the police to show other sorts of highly inculpatory evidence to suspects who have invoked their right to silence. *See United States v. Pheaster*, 544 F.2d 353 (9th Cir.1976) (telling suspect his fingerprints were found on kidnappers' note not interrogation), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *Combs v. Wingo*, 465 F.2d 96 (6th Cir.1972) (confronting suspect with ballistics report not interrogation); *Lewis v. State*, 508 So.2d 358 (Fla.App.1986) (showing suspect videotape of robbery not interrogation), *cert. denied*, 486 U.S. 1036, 108 S.Ct. 2025, 100 L.Ed.2d 612 (1988); *State v. McLean*, 294 N.C. 623, 242 S.E.2d 814 (1978) (displaying suspect's belongings found at scene of crime not interrogation). *But see Koza v. State*, 102 Nev. 181, 718 P.2d 671 (1986) (informing suspect of incriminating palm print and ballistics report constitutes interrogation), *cert. denied*, — U.S. —, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989); *People v. Ferro*, 63 N.Y.2d 316, 482 N.Y.S.2d 237, 472 N.E.2d 13 (1984) (confrontation with stolen goods is interrogation), *cert. denied*, 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985); *State v. Mills*, 6 N.C.App. 347, 170 S.E.2d 189 (1969) (same). As is the case with the confession jurisprudence discussed in the text, most of the cases, with noteworthy exceptions, pre-date *Innis*. Having so noted, we decline to comment on whether these cases were correctly decided, though some of them undoubtedly raise concerns very similar to those at issue in this case. For present purposes, we hold only that confronting a suspect with his alleged partner and the fact that the partner has confessed is an "action that the police should know is reasonably likely to elicit an incriminating response."

6. This is not a case in which the police have done nothing more than advise a suspect that they have the confession of a suspected accomplice. Such a case would present a more difficult issue, one we have no occasion to address here. We believe the presence of the suspected accomplice when the fact of a confession is disclosed, adds substantially to the likelihood that an incriminating response will be provoked.

7. The court noted that
[i]n this case, at least some of the officials knew that Vazquez and Pizarro were providing inconsistent stories about their relationship. Thus, it could be argued that the customs agents should have known that the conflicting stories would make Vazquez feel unusually pressured when confronting Pizarro to say something that would persuade the authorities that he did not know Pizarro. In addition, unlike in *Mauro*, the authorities here could be reasonably sure of the nature of the comments likely to be made by the suspect and his possible associate.... In *Mauro*, where the two individuals were husband and wife and there was no previous conflict in their statements to police officers, it arguably was less likely that any conversation would be ... "incriminating."
857 F.2d at 863.

that the confrontation did not rise to the level of custodial interrogation. In doing so, however, the court registered the following qualification:

In this case, the record shows a sudden, spontaneous exchange between Vazquez and Pizarro as soon as Vazquez was brought into the supervisor's office. There is no suggestion that the customs agents thrust Vazquez in front of Pizarro in an effort to "elicit" a comment from either of them. Nor is there evidence of any other tactic designed to encourage Vazquez or Pizarro to erupt upon the meeting ... [including] evidence that the officers had primed Vazquez for the meeting by expressly confronting Pizarro head-on.

Our conclusion on whether a Miranda violation occurred might well be different had Vazquez presented evidence showing that the customs agents sought to elicit incriminating statements from him. ... There is, for example, no evidence that the customs agent who brought Vazquez to the supervisor's office even knew that Pizarro already was there. In fact, the officers may simply have been processing Pizarro in the supervisor's office and, by happenstance or ordinary process, Vazquez was brought to the same room.

857 F.2d at 863.

There is no question that *Vazquez* and our case bear important similarities. Vazquez and Pizarro, like Nelson and Moore, were placed together after one had confessed. And though it does not appear that Vazquez had been informed of Pizarro's confession, he apparently had learned that Pizarro had deviated from their agreed upon story by saying that he knew Vazquez. That is presumably why Vazquez, upon entering the office, immediately questioned Pizarro why he had told the authorities they knew each other. On the other hand, informing a suspect that his partner's responses differ from his own is clearly not the same as informing him that the partner said he raped and killed someone. Furthermore, our case involves

precisely the kind of police misconduct that worried the First Circuit in the passage quoted above: the police knowingly confronted Nelson with Moore for the sole purpose of eliciting an incriminating response and Moore had been "primed" by the police specifically for that purpose. For these reasons, we believe *Vazquez* is consistent with this decision.

The same is true of the Supreme Court's recent decision in *Illinois v. Perkins*, — U.S. ——, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In that case, an undercover agent posing as a prison inmate was placed in the suspect's cell in order to elicit incriminating remarks. The suspect was "lulled into a false sense of security" by the ploy, and gave several inculpatory responses to the agent's questions about whether the suspect had ever "offered someone." The Court held that the police were not required to Mirandize the suspect prior to questioning by the agent because the suspect did not perceive himself to be in a custodial interrogation context. Absent such a perception, the Court reasoned, the suspect does not face the kind of coercive pressures that justify the prophylactic measures required by *Miranda*.

This case differs from *Perkins* in two important ways. At the time Moore confronted Nelson, the police had recently attempted to question Nelson about the rape and murder and had read him *Miranda* warnings. Nelson had refused to speak with the police, invoking his right to cut off questioning, but he remained in the interrogation room and it was the police who brought Moore to that room for the confrontation. Thus, when Nelson made his incriminating remark, he remained the subject of a custodial interrogatory process controlled by the police. The Court in *Perkins* stressed that *Miranda* "was meant to preserve the privilege during 'incommunicado interrogation of individuals in a *police-dominated atmosphere.*'" *Perkins*, 110 S.Ct. at 2397 (*quoting Miranda*, 384 U.S. at 445, 86 S.Ct. at 1612) (emphasis added). While the atmosphere of the cellblock in which Perkins boasted of his ex-

ploits to an undercover officer was, from his perspective at least, devoid of police "domination", the interrogation room where Nelson was confronted with Moore was saturated with it.

Moreover, the Court in *Perkins* addressed a situation where the police through "strategic deception" took advantage of the suspect's "misplaced trust in one he suppose[d] to be a fellow prisoner." *Perkins*, 110 S.Ct. at 2397. This misplaced trust led Perkins to believe that his statements would not reach police ears. As a result, Perkins was not influenced by the two factors that *Miranda* identified as contributing to the inherently coercive nature of custodial interrogations: fear of reprisal for keeping silent, and hope for leniency for confessing. *See id.* By contrast, when a suspect is confronted with an accomplice who he knows has confessed, he has every reason to believe that the accomplice is cooperating with the police and that whatever he says will be communicated to them. The suspect will thus have the same incentive to speak as he would in any interrogation by the police.

▆ Thus, while the parties dispute whether a police officer was in the room at the time of Nelson's confrontation with Moore, we view that fact as irrelevant under the circumstances of this case. Since *Perkins'* official compulsion requirement would clearly be satisfied if, after the suspect attempted to cut off questioning, the police announced that the suspect's partner had implicated him, the police surely cannot avoid *Miranda* by simply walking out of the interrogation room and sending in the partner to say he told the police exactly the same thing.[8]

The preceding analysis assumes that Moore had already told Nelson about the confession before Nelson made his inculpatory remark. As we stated earlier, however, that fact has yet to be resolved. We therefore proceed to analyze the case under the contrary assumption that Nelson made his remark before being informed of the confession, and that Moore said and did nothing, other than enter Nelson's interrogation room, to provoke a response from Nelson. Under this assumption, the facts here are even less troubling than those found not to amount to interrogation in the First Circuit's decision in *Vazquez*, since Nelson had not even been told that his partner had given the police a conflicting story.

As the court in *Vazquez* recognized, we know from *Arizona v. Mauro* that, under some circumstances, the police may place suspects together even though one has invoked the right to cut off questioning. We do not think that the fact that Moore and Nelson are unrelated made the confrontation materially more likely to elicit an incriminating response from Nelson than the meeting sanctioned in *Mauro*. Furthermore, unlike the ploys criticized earlier, the suspect in this scenario has no reason to believe that he has been identified by a witness to the crime. Nor does simply placing the partners together implicitly posit the suspect's guilt.

This is not to say that such a confrontation has no coercion element. All other things being equal, the fact that the police have taken a suspect's partner into custody increase to some degree the chance they will discover some incriminating information. Without more, however, we do not think the disclosure of the fact that a suspected accomplice has been questioned is of sufficient moment to implicate *Innis'* standard of "acts reasonably likely to elicit an incriminating response."

For these reasons, we will remand to the district court for an evidentiary hearing on the question of whether the fact of Moore's confession had been communicated to Nelson by Moore or the police prior to Nelson's inculpatory remark.[9] If it is determined

---

8. Indeed, from the standpoint of how likely such a ploy is to elicit an incriminating response, the fact that the partner himself acts as the conduit makes the revelation all the more powerful by eliminating any chance that the police are bluffing.

9. If, on remand, the parties are able to locate additional portions of the trial court record and those portions contain a record supported finding with respect to this crucial fact, an evidentiary hearing may not be necessary. We understand from the parties, however, that they have

that the police or Moore had already disclosed the confession when Nelson posed his incriminating question, then the district court should grant Nelson's petition unless the Commonwealth undertakes to retry him within a reasonable period of time. Conversely, if prior to Nelson's question, neither the police nor Moore had communicated to Nelson by words or conduct [10] the fact of Moore's confession, his petition should be denied.

## IV.

*Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), qualifies *Miranda's* prophylactic ban against police interrogation once the suspect invokes his right to remain silent. In *Mosley*, the Supreme Court held that if the police stop interrogating a suspect immediately after the suspect invokes his right to remain silent, they may later resume their interrogation if, in so doing, they "scrupulously honor" the suspect's request to cut off questioning. *Id.* at 104, 96 S.Ct. at 326. Thus, *Mosley* only becomes relevant if the conduct of the police amounts to interrogation under the cases discussed in the preceding section.

The Commonwealth argues that even if the confrontation was interrogation under *Innis*, the conduct of the police falls under *Mosley's* exception to the general rule against custodial interrogation of a suspect who has invoked the right to silence. Borrowing *Mosley's* oft-quoted expression, the Commonwealth contends that the police "scrupulously honored" Nelson's request that they cut off questioning when they confronted him with his alleged partner in crime. For reasons explained below, we conclude that virtually every aspect of that confrontation suggests that the police failed to respect Nelson's right to remain silent.

*Mosley*, 423 U.S. at 97, 96 S.Ct. at 323, involved a suspect who was arrested on robbery charges and invoked his right to remain silent. Several hours later, Mosley agreed to answer questions concerning a related homicide after hearing a fresh set of Miranda warnings. He confessed shortly thereafter. At trial, the state court admitted Mosley's confession over his objection that this second round of interrogation violated *Miranda* and thus mandated suppression. The Supreme Court affirmed, reasoning that though *Miranda* required police to immediately stop an interrogation when a suspect invokes his or her right to silence, the decision was not intended to prohibit the police from questioning a suspect under any circumstances from that point forward:

> We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored....
>
> This is not a case ... where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

*Id.* at 104–06, 96 S.Ct. at 326–27. *Miranda*, the Court concluded, did not prohibit the resumption of questioning under these circumstances.

██ While the Commonwealth argues that it fulfilled its duty to scrupulously

---

exhausted the possibility of finding additional segments of the trial court record.

**10.** We use the expression "words or conduct" deliberately. Just as *Innis'* standard does not require that the police engage in direct questioning of the suspect, the distinction we have

drawn does not require that the police must have told Nelson in so many words that Moore had confessed; all that is necessary is that the police must have engaged in conduct reasonably likely to communicate to Nelson that Moore had confessed.

honor Nelson's right to cut off questioning, its confrontation ploy bears none of the indicia of respect identified in *Mosley*. The Commonwealth failed to contend, let alone to demonstrate, that it waited a significant amount of time after Nelson cut off questioning, that it gave Nelson a fresh set of *Miranda* warnings, that Nelson had invoked his right in connection with an offense other than the rape and murder, or that the officers who engineered the confrontation were different from those to whom Nelson initially refused to talk. *See United States v. Hsu*, 852 F.2d 407, 411 (9th Cir.1988) (holding that provision of fresh *Miranda* warnings is most important of the factors listed in *Mosley*); *United States v. Udey*, 748 F.2d 1231, 1242 (8th Cir.1984) (holding that substantial interval between rounds of questioning and fresh warnings satisfied duty to scrupulously honor suspect's right to cut off interrogation), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3477, 3478, 87 L.Ed.2d 613 (1985); *Stumes v. Solem*, 752 F.2d 317 (8th Cir.1985), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985); *State v. Hartwig*, 123 Wis.2d 278, 366 N.W.2d 866 (1985); *United States v. Bosby*, 675 F.2d 1174 (11th Cir. 1982); *Dodson v. State*, 513 A.2d 761 (Del. Supr.1986); *McDougle v. State*, 355 So.2d 1386 (Miss.1978); *Commonwealth v. Walker*, 470 Pa. 534, 368 A.2d 1284 (1977). On the contrary, all the evidence suggests that the detectives used the ploy "for no other reason than to induce the defendant to change his mind." *Vujosevic v. Rafferty*, 844 F.2d 1023, 1029 (3d Cir.1988). By their own admission, the police, on the heels of Nelson's attempt to cut off questioning, conceived of and implemented the confrontation for the purpose of eliciting an incriminating response from Nelson. This *Mosley* and its progeny do not permit.

At oral argument, the Commonwealth's attorney took the position that we should approve the confrontation on the basis of Justice White's lone concurrence in *Michigan v. Mosley*, 423 U.S. at 107, 96 S.Ct. at 328. Justice White's opinion in *Mosley* turns on his contention that *Miranda's* prophylactic bar against interrogation does not apply where the suspect invokes his right to silence, but does not ask for a lawyer. In such cases, Justice White argued, suspects' responses to continued interrogation should be inadmissible only if involuntarily or unknowingly made. A footnote in the concurring opinion deals with cases like Nelson's:

> The majority's rule may cause an accused injury. Although a recently arrested individual may have indicated an initial desire not to answer any questions, he would nonetheless want to know immediately—if it were true—that his ability to explain a particular incriminating fact or to supply an alibi for a particular time period would result in his immediate release. Similarly, he might wish to know—if it were true—that (1) the case against him was unusually strong and that (2) his immediate cooperation with the authorities in the apprehension and conviction of others or in the recovery of property would redound to his benefit in the form of a reduced charge. Certainly the individual's lawyer, if he had one, would be interested in such information, even if communication of such information followed closely on an assertion of the "right to silence." Where the individual has not requested counsel and has chosen instead to make his own decisions regarding his conversations with the authorities, he should not be deprived, even temporarily of any information relevant to the decision.

*Id.* at 109 n. 1, 96 S.Ct. at 329 n. 1. Were this the law, we would be inclined to agree with the Commonwealth. However, the majority of the Court has declined to adopt this approach. The Court instead applies *Miranda's* prophylactic ban on the interrogation of suspects who have invoked their right to silence, subject only to the exception that the police may resume questioning if the circumstances suggest they "scrupulously honored" the suspect's original request. The Commonwealth fails to point to a single aspect of this case that suggests that the police respected Nelson's request to remain silent. Accordingly, if the district court finds that the confrontation violated *Miranda* and *Innis'* threshold

prohibition against interrogation, then it follows that they also failed to scrupulously honor Nelson's right to cut off questioning.

### V.

Nelson's contention that the confrontation also violated his Sixth Amendment right to counsel merits only brief attention. In *United States v. Muzychka*, 725 F.2d 1061 (3d Cir.), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984), this Court squarely addressed when the Sixth Amendment right to counsel attaches. The defendant, Muzychka, was arrested by the police, but was released without any explanation and no formal charges had been filed. Muzychka later made incriminating statements to an informant for the FBI. We rejected Muzychka's claim that his Sixth Amendment right to counsel attached at the time of his initial arrest or even when he became the focus of the FBI's investigation. The right to counsel, we held, "attaches 'at or after the initiation of adversary judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Id.* at 1068 (quoting *Moore v. Illinois*, 434 U.S. 220, 226, 98 S.Ct. 458, 463, 54 L.Ed.2d 424 (1977)). Since Muzychka had yet to face "the prosecutorial forces of organized society" in any of these proceedings, *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), his right to counsel had not attached when he made his incriminating statements. *See also United States v. Howard*, 752 F.2d 220 (6th Cir.) ("[Defendant] was only the target of the government's investigation at the time of his conversations with the government informant; he was not under arrest and no indictment or other formal charges had been filed. Thus, his Sixth Amendment rights had not attached."), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985).

■ Nelson is in precisely the same situation. Indeed, not only had not Nelson been arraigned or indicted at the time of the confrontation, he had not even been arrested for the rape and murder. Under these circumstances, *Muzychka* teaches that Nelson's Sixth Amendment right to counsel had not yet attached.

### VI.

For these reasons, we will affirm the district court's rejection of Nelson's Sixth Amendment claim. We will reverse the district court's judgment, however, and remand for further proceedings consistent with this opinion on Nelson's Fifth Amendment claim.